## GUARDIAN LIFE INS. CO. OF AMERICA v. CLUM.

### No. 6892.

Circuit Court of Appeals, Third Circuit.

Sept. 14, 1939.

Edward W. Warren and C. P. O'Malley, of O'Malley, Hill, Harris & Harris, both of Scranton, Pa. (D. Curtis Robertson, of New York City, of counsel), for appellant.

Harold R. Wruble and M. H. Salsburg, both of Wilkes-Barre, Pa., and Abram Salsburg, of Wilkes-Barre, Pa., for appellee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiff-appellee leans heavily, and, under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, properly, on two doctrines of the Pennsylvania courts. The first is "good faith" as the touchstone for answers in applications for life insurance. All the cases cited in either brief are collected in 20 Vale Pennsylvania Digest, sub nomine Insurance, ⊕256(2), p. 429. The second is the narrow scope of the court's power to enter judgments non obstante veredicto, 22 Vale Pennsylvania Digest, sub nomine Judgment, ⊕199(3), p. 325. The emphasis of the Pennsylvania courts upon the mind behind the misrepresentation is not in accord with the holdings in a majority of jurisdictions, 39 Yale Law Journal 283 (note) (an odd distinction between equity and law prevails in New Jersey, New York Life Ins. Co. v. Marotta, 3 Cir., 57 F.2d

1038; Weintrob v. New York Life Ins. Co., 3 Cir., 85 F.2d 158). It has been criticized in the local law journals, 11 Temple Law Quarterly 267 (note), and by the local authors, Magaw, Representations in the Law of Life Insurance, 11 Temple Law Quarterly 463. However that may be, we do not think it a reed stout enough to support the ruling of the lower court in the case at bar.

Counsel for plaintiff-appellee commences his "statement of the case" with an unwarranted (the more so because irrelevant) attack on the character of an innocent woman. He states that the insured divorced his wife "for cause" and attempts the implication that we should believe the worst. Whereas the fact quite clearly appears that the "cause" arises from some marital incompatability settled by the not unusual procedure of a divorce unopposed and sugared by a financial settlement.

The only purpose of this unchivalrous performance seems to be the introduction of the beneficiary to the jury and to us in a favorable light. The latter, a widow (sod not grass) entered the deceased insured's employ as a bookkeeper shortly after he moved from Dingmans Ferry, Pa., to Milford, Pa., in pursuance of a plan to expand his meat business. She soon became more than a mere wage slave. We find the deceased going to live at her house and entrusting her with his ambitions both for his business and for insurance. Their friendship eventually ripened into an engagement for marriage. As a first preliminary, of course, a divorce was necessary, was initiated, and was secured in final form on February 8, 1935. As a second preliminary, the deceased desired the financial security of his fiancee. In fact, this desire seems to have been first in time. He applied for insurance in 1931 but was refused as not in a position to marry the beneficiary. The second application (to a different and defendant-appellant company) was contemporaneous with that happy change of status.

This praiseworthy wish to provide for the object of his affections may have been chronologically stimulated by some specific sense of the impermanence of this "mortal coil". We say specific because the deceased complained of pain under his breast-bone (sternum). The pain seems to have been sufficiently disturbing to impel medical consultations. These took place

594

in the late summer and fall of 1934 and the locus in quo was New York City (3½ hours from Milford by train). We are not advised of the roster of professional skill in insured's hometown of Milford. There was at least one doctor there. The latter brought about this litigation by passing the deceased for insurance. At any rate, the deceased preferred the talent of the metropolis although he ended up with a physician, Dr. Plummer, a heart specialist, in practice a few years only. This doctor was visited, at his office, once a day on August 15th, September 12th, 18th and October 22nd, and, at the hospital, twice a day from October 1st to 5th. During these visits and during this hospitalization thorough physical examinations, accompanied by all the standard tests, were made. In addition, Dr. Plummer sent the insured to another doctor (Berea) for a cardiographing.

The trial status of the resulting cardiogram is confusing and we may say rather typical of the American way of presenting cases. The doctor (Berea) who made it is not called. Therefore, although no one disputes its authenticity, it is not technically proven. The learned trial judge first excluded it (R. 126) and then, apparently, changed his mind and admitted it (R. 134). We say apparently because his ruling leaves us in doubt as to whether he intended the admission for all purposes or only for its disclosure to, and therefore the knowledge of, the deceased. The same doubt appears to have influenced defendant-appellant's counsel for his brief does not rely on it. This is the more curious as the cardiogram has significance because of its contents ("evidence suggests rather marked myocardial damage" R. 219), because of its form (documentary) and because of its very existence (another false representation, question 8g of the application).

We began this opinion by reference to the two doctrines peculiar to Pennsylvania law, upon which plaintiff-appellee relies. We do not think that either of them justifies that reliance. The learned commentators on the good faith rule point out the grave abuses to which it is open. We might hazard a guess that it was originally promulgated by courts impatient at the technical tactics of insurance companies and their learned and adroit counsel. Assuming all that, the rule does not go to the length here contended for. The deceased answered two questions in his application and answered them both falsely. They are:

"9. Name all physicians and practitioners you have consulted * * * * within the last five years, * * *. None.

"10. Have you ever been a patient in any hospital, * * *? No." R. 17.

As to the first, the plaintiff-beneficiary finds him pure in heart although false in fact, because she denies the disinterested doctor's testimony that the insured was fully advised by him of the seriousness of his condition. As to the second, the plaintiff-beneficiary says he innocently took the word "patient" to apply at the exact point where diagnosis ends and therapy begins. We suggest that both contentions are untenable.

The Pennsylvania decisions compel us to avoid what seems to us unavoidable logic. They constrain the abandonment of the simple and sensible theory that an accurate report of medical attendance affords an insurer an opportunity for investigation and correspondingly affords a basis for acceptance or rejection of risk. The Pennsylvania cases do not, however, purport to entirely emasculate the processes of recollection. To the reasonable working of those processes, then, we must look. In other words, a normal man is not allowed to go too far in basing his good faith on assertions that he has forgotten what those in possession of their ordinary faculties would remember. It is for that reason that the cases stress physical condition at the time of the medical attendance in question. In so stressing that condition, we think that they sometimes do not place it in its proper framework. That framework is clearly subjective and not objective. As we are interested in the mental scar tissues of our applicant, we are interested not only in what his doctor tells him he has, but also in what he went to that doctor thinking he might have. To illustrate: one would remember both if one went to a physician for diagnosis or treatment for a suspected cold and was told one had diabetes and also if one went for diagnosis or treatment of a suspected disease of the heart and was told that one had a broken rib.

We think that it is in just this respect that plaintiff-appellee has misapprehended the ratio decidendi of the authorities. The record is replete with testimony from the mouth of the beneficiary directed to discounting any assumption of illness. She categorically denied the positive assertions of the examining physician that his diagnosis was heart disease, that he had, as was his duty, so advised his patient and that he had prescribed both drugs (digitalis —theocalcin) and a course of conduct (light diet, less exertion, and more rest). We believe that these denials overlook the fact that there is no inconsistency between the serious and even tragic nature of a patient's anticipation and the subsequent happy realization that his fears are groundless. By plaintiff-appellee's admission, the deceased visited a heart specialist four times in two months and was visited by that heart specialist fourteen times in one week. That heart specialist sent him to another expert on the heart who gave him the standard and rather elaborate test for ascertaining the welfare of that portion of the body. Whether such visits were "periodic"—plaintiff-appellee's word—or spasmodic, they related to the organ upon whose successful functioning the existence of mind, the seat of memory, depends. As the mind concerns itself with its own existence, that concern is likely to groove its channels. This argument does not even take into account the fact that repeated consultations (16) for even a minor ailment (such as a cold) might be said to groove those channels by mere constant reiteration.

Our use of the word "patient" will have been observed. We have, under the Pennsylvania rule, been considering the question of honest memory. In passing upon the answer to the second inquiry, we appraise the question of honest interpretation, like memory, a mental process. If the assured had been a philologist instead of a butcher, he might have interpreted the term "patient" in its etymological sense. As it derives from the Latin verb "patio"—to suffer—he might then have been entitled to raise the same issue of fact of his physical condition that we have been discussing. To the man in the street, or in this case the shop, patient plainly connotes a recognized type of professional relationship. A patient is to a doctor what a client is to a lawyer; one who is seeking the benefit of the skill which that doctor or lawyer has been trained to supply. Obviously the emphasis is on the engagement of that skill and not upon the use to which it is afterwards put. There are those who maintain that diagnosis (a Greek word combined from the verb to know and the preposition between), the search for causes, is far more difficult than the elimination of those same causes. Symptoms are obscure and capable of many constructions; remedies are standard and capable of predictable effect. If patient means one who seeks a physician in his professional capacity, the same must be true of one who enters a hospital in the same role. Such an institution is simply a convenient place where the skill of doctors can be obtained. If that skill includes diagnosis, it follows that an inmate of a hospital, who is there for that purpose, is a patient.

We do not intend to spend much time on the Pennsylvania rules governing judgments n.o.v. Here again we find the courts of that State occupying an isolated position. Their requirement of admissions or documents in corroboration of even uncontradicted testimony seems to bottom rather on the history of judgments n.o. v. at common law, 33 C.J. 1184, than upon the speedy accomplishment of justice. The visits to the heart specialist and the week in the hospital are admitted. Under the theory of the law we have endeavored to expound, that is sufficient. Resort to the specialist's prescription of well-known heart specifics (digitalis and theocalcin) becomes superfluous. We also reserve for some appropriate time an interesting and complicated question arising out of the Supreme Court's decision in Erie R. Co. v. Tompkins, above cited. That question is the latter case's application to the entering of directed verdicts and judgments n.o.v. A cogent argument for putting the exercise of the n.o.v. power in a category with res ipsa loquitur; presumptions and burden of proof, might be made. Such an argument leads to its consideration as a procedural rather than as a substantive question and the consequent inapplicability of the Erie R. Co. v. Tompkins rule. After Erie Railroad v. Tompkins: Some Problems in "Substance" and "Procedure", 38 Columbia Law Review 1472 (note), but see Cook, "Substance" and "Procedure"

in the Conflict of Laws, 42 Yale Law Journal 333.

The judgment of the District Court is reversed and the cause is remanded with directions to enter a judgment for the defendant non obstante veredicto.