## Freedman *v.* The Mutual Life Insurance Company of New York, Appellant.

Argued May 13, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Douglass D. Storey,* of *Hause, Storey & Lick,* with him *Frederick J. Templeton* and *Louis W. Dawson,* for appellant.

*J. Boyd Landis* and *E. M. Biddle, Jr.,* for appellee.

OPINION BY MR. JUSTICE DREW, June 30, 1941:

This action of assumpsit was instituted by Esther Freedman, as beneficiary, to recover the proceeds of a policy of life insurance issued by defendant to her husband, who died on January 5, 1939. Payment was refused upon the grounds that the insured was not in good health at the time the policy was applied for and issued, and that he gave false and fraudulent answers to medical questions in his application. The case was tried in the court below and the jury found for plaintiff. A new trial was awarded by the court en banc, but defendant has taken this appeal from the refusal of its motion for judgment. n. o. v.

On May 2, 1938, the insured, Edgar Freedman, a capable business executive, 48 years of age, applied to defendant for a $5,000 policy of life insurance. He was asked the following question by the defendant's medical examiner: "20. State every physician or practitioner whom you have consulted, or who has prescribed for or treated you in the past five years for any ailment, serious or not serious." The insured answered, "None". In answer to the question: "22. Have you stated in answer to question 20 every physician or practitioner consulted during the past five years and dates of consultation?", he answered: "Yes". These questions and answers formed part of the application, which the insured signed and affirmed to be true. The policy issued on May 20, 1938, with the proviso that it should not take effect unless received during the insured's "continuance in good health" and until the first premium should have been paid under the same circumstances.

The insured died within eight months of the effective date appearing on the policy.

At the trial, defendant offered evidence to show that the insured died of coronary occlusion, which is the closing of the coronary artery feeding blood to the heart muscle, and that during the five-year period referred to in questions 20 and 22 he had consulted or visited five physicians for various complaints. Dr. Robert Denison testified from his records that the insured had consulted him nine times from October to December, 1934, complaining of nervous and digestive disorders, with pains and a hollow feeling in his chest. Dr. Denison examined his heart, and directed him to obtain a cardiogram reading. During October he found the insured's blood pressure high. In November, another examination disclosed "poor heart tones" and lowered blood pressure, and the physician prescribed digitalis, a heart stimulant.

Dr. Guy E. Ohlson testified that the insured visited him once in October, 1934, for a cardiogram of his heart. The results indicated certain irregularities which the doctor testified might be attributable to an impairment of the condition of the heart.

Dr. John B. McAlister testified from his notes that the insured consulted him six times from November, 1936, to June, 1937, complaining chiefly of dizziness and constipation. Although the doctor found no definite evidence of heart trouble, he stated that the insured was "heart conscious", and that on one visit his heart action was irregular and a heart tonic was given. The office memoranda or records of this physician, made at the time of consultation and including a statement of the insured's complaints, the results of his examination, and the treatment prescribed, were admitted by the trial judge as documentary evidence of the facts therein contained under the Uniform Business Records as Evidence Act of May 4, 1939, P. L. 42, 28 PS section

91. The records of Dr. Denison and the cardiogram made by Dr. Ohlson were also admitted on this authority for the same purpose.

It was also stipulated that the insured had made four calls upon Dr. L. C. Goldman in December, 1937, and three in March, 1938, receiving treatment for colds. The druggist who filled various prescriptions for the insured, including one for digitalis, testified that two of the prescriptions had been refilled by the insured 30 times, although the digitalis was dispensed but once. Copies of these prescriptions were admitted in evidence.

In rebuttal, plaintiff and the insured's secretary testified that they had never known him to miss a day from his work for illness, that his health was good until the day of his death, and that they had no knowledge of his visits to the physicians who testified. They stated that he was an indefatigable worker, taking no vacations and devoting only five or ten minutes to his meals.

In granting the new trial, the court below held that there was sufficient proof, documentary and otherwise, to establish that the insured gave false answers to the questions involved, and that the verdict of the jury was against the weight of the evidence. Judgment n. o. v. was refused, however, upon the ground that there was no uncontradicted, documentary proof of bad faith, which would warrant the withdrawal of the case from the jury. We think in so doing the court below mistook the effect of our decisions. The rule governing cases of this sort was set forth in *Evans v. Penn Mutual Life Ins. Co.*, 322 Pa. 547 (and reiterated in *Indovina v. Metropolitan Life Ins. Co.*, 334 Pa. 167, *Bailey v. Pacific Mutual Life Ins. Co.*, 336 Pa. 62, and *Reeder v. Metropolitan Life Ins. Co.*, 340 Pa. 503), at p. 555: "Where it affirmatively appears, from sufficient documentary evidence, that the policy was issued in reliance on false and fraudulent statements, made by or on behalf of the insured, as where false answers are shown to have been given by the insured *under such*

*circumstances that he must have been aware of their falsity,* the court may direct a verdict or enter judgment for the insurer." (Italics added.) Thus, where it is established by uncontradicted documentary evidence that the insured has consulted physicians so frequently, or undergone medical or surgical treatment so recently, or of such a serious nature, that a person of ordinary intelligence could not have forgotten these incidents in answering a direct and pointed question in an application for insurance, bad faith may be inferred as a matter of law if the insured denies in his answer that any physician has been consulted, or medical or surgical treatment has been received during the period of inquiry.

It is true, as stated in *Adams v. Metropolitan Life Ins. Co.,* 322 Pa. 564, 567: ". . . the failure to report every attendance or treatment by a physician does not alone constitute fraud, as for instance where the application does not disclose attendance for headaches, grippe, acute colds, indigestion, or other comparatively minor illnesses." But the inadvertent omission to refer to isolated and trivial medical attentions cannot be confused with deliberate falsifications or plain disregard for the truth. The credulity of the court cannot be taxed too far by pleas of forgetfulness. Thus in *Guardian Life Ins. Co. of America v. Clum,* 106 F. (2d) 592 (CCA 3d, 1939), where the insured did not report visits to physicians and the taking of a cardiogram of his heart action in applying for insurance, the court correctly stated the rule of the Pennsylvania cases to be that (p. 594) "a normal man is not allowed to go too far in basing his good faith on assertions that he has forgotten what those in possession of their ordinary faculties would remember." See *Bailey v. Pacific Mutual Life Ins. Co.,* supra (where the insured had consulted four physicians on 13 occasions) ; *Indovina v. Metropolitan Life Ins. Co.,* supra; *Kanatas v. Home Life Ins. Co.,* 325 Pa. 93; *New York Life Ins. Co. v.*

*W. Bodek Corp.*, 320 Pa. 347; *Kzyszton v. John Hancock Mutual Life Ins. Co.*, 320 Pa. 65; *Koppleman v. Commercial Casualty Ins. Co.*, 302 Pa. 106. Illustrations of this principle might be multiplied, but a quotation from *Reeder v. Metropolitan Life Ins. Co.*, supra, at p. 506, strikingly applicable to the facts of the present case, should be sufficient: "In the present case plaintiff admits in her reply that the insured had consulted three physicians for his general physical condition, had been advised by one to have his heart examined, and had also had his stomach X-rayed by a prominent roentgenologist. Therefore, how can it reasonably be claimed that when the insured signed the application that he had completely forgotten or innocently overlooked these frequent consultations or examinations for obviously more than slight or mere temporary indispositions within the previous period of but seven months."

Here the uncontradicted testimony of the witnesses for the defendant showed that the insured had made 20 visits to four physicians in the period embraced by the questions in the application. These questions were far more comprehensive than those involved in the *Adams* and *Evans* cases, calling for the name of "every physician or practitioner *whom you have consulted, or who has prescribed for or treated you* in the past five years for any ailment, *serious or not serious.*" (Italics added.) The insured was a mature and competent businessman. One of the medical witnesses testified that he was "heart conscious". It cannot be assumed that he had honestly forgotten these courses of medical treatment or that the prescription of digitalis and the taking of the cardiogram could have made no impression upon his memory. He could not have ignored or misunderstood the plain and wide scope of the questions asked. The only reasonable assumption that can be drawn from the testimony is that the insured knowingly

and fraudulently gave false answers. This was also the conclusion of the learned court en banc.

The verdict of the jury was clearly opposed to the uncontradicted evidence, and the court below was guilty of no abuse of discretion in setting it aside. The only question that remains is whether defendant was entitled to the entry of judgment upon the record. We stated in the *Evans* case that the entry of such judgment is proper only if the defense is established by uncontradicted documentary evidence. Where it is based entirely upon oral testimony, the credibility of the witnesses, though uncontradicted, is for the jury under the doctrine of *Nanty-Glo Borough v. American Surety Co.,* 309 Pa. 236. And where the documentary evidence relied upon is contradicted by other written evidence or oral testimony, the issue must be submitted to the jury: *Osche v. New York Life Ins. Co.,* 324 Pa. 1; *Lilly v. Metropolitan Ins. Co.,* 318 Pa. 248; *Kuhns v. New York Life Ins. Co.,* 297 Pa. 418.

The written evidence admitted in the present case consisted of record cards made by Dr. Denison and Dr. McAlister of the visits of the insured, history and treatment, the cardiogram prepared by Dr. Ohlson, and copies of the prescriptions filled by the pharmacist. The competency of this evidence, and its admissibility is challenged by plaintiff and raises a new question.

The admissibility of hospital records as documentary evidence in cases of this sort is expressly recognized in the *Evans* case, where it was said (p. 560): "If such falsity and the requisite bad faith affirmatively appear (a) from competent and uncontradicted documentary evidence, such as hospital records, proofs of death or admissions in the pleadings . . . a verdict may be directed for the insurer." This language is quoted with approval in the *Bailey* and *Indovina* cases. See also *Sack v. Metropolitan Life Ins. Co.,* 115 Pa. Superior Ct. 430; *Sebastiani v. Ind. Order of Foresters,* 106 Pa.

Superior Ct. 525; *Panopoulos v. Metropolitan Life Ins. Co.*, 96 Pa. Superior Ct. 325. The limitations on this exception to the hearsay rule are set forth in *Paxos v. Jarka Corporation*, 314 Pa. 148, 153, where we held that such records must satisfy three probative requirements: (1) they must be made contemporaneously with the acts to which they purport to relate; (2) there must have been present at the time no contemplative motive for falsification; (3) they must have been made by a person having knowledge of the facts set forth, or one competent to predicate a medical and scientific opinion on the facts.

When the records meet these requirements, they are competent to show the fact of hospitalization, the treatment prescribed *(Loder v. Metropolitan Life Ins. Co.,* 128 Pa. Superior Ct. 155; *Robinson v. Metropolitan Life Ins. Co.,* 99 Pa. Superior Ct. 152), and the statements of symptoms given by the insured upon examination *(Baxter v. New York Life Ins. Co.,* 115 Pa. Superior Ct. 287, 295).*

Should the records of a practising physician, made in the course of his professional business, be placed in the same category? Clearly the cards introduced in the present case meet the three requirements prescribed in *Paxos v. Jarka Corporation*, supra. They were made contemporaneously with the visits of the insured and his examinations. They were made under circumstances which suggest no motive for falsification. They were made by licensed practitioners, with personal knowledge of the results of their examinations and of the statements made to them by the insured. It is true, as plaintiff states, that the book entries of physicians, offered for the purpose of proving claims

---

* As to the statutory admissibility of hospital records in Workmen's Compensation cases, see *Thomas v. De Commene*, 133 Pa. Superior Ct. 489; *Parks v. Miller Printing Mach. Co.,* 133 Pa. Superior Ct. 530; *Miller v. Pittsburgh Coal Co.,* 129 Pa. Superior Ct. 1; *Leed v. State Work. Ins. Fund,* 128 Pa. Superior Ct. 572.

for professional services rendered were of doubtful admissibility at common law. The rigid limitations upon the shop-book rule, whereby tradesmen were permitted to show the number and price of materials furnished and the value of services rendered, are self-explanatory. They were made necessary by the ever-present possibility of fraudulent, self-serving entries which might be relied upon to advance false claims against those who had no opportunity to inspect or correct the books. The reluctance of the courts to extend this rule to claims for professional services, the value of which might well be difficult of ascertainment and demonstration, is understandable. See *Croushore's Est.*, 79 Pa. Superior Ct. 286, citing *Fulton's Est.*, 178 Pa. 78.

The two cases cited, however, have no application to the present situation. The records of the physicians are not here offered to prove the value of their services, but to establish certain medical facts. Those by whom the records were made are not parties to this action and have no interest in its termination or incentive to falsify the relevant facts. They personally examined the insured and prescribed for him. They heard his statements of symptoms made for the purpose of medical treatment. These facts were recorded at the time they transpired and in the course of the professional business of the physicians. They were fully as competent to compile these records as those by whom the records of the usual hospital are prepared. Certainly the records should be documentary evidence of the number of visits of the insured and the treatment prescribed. They should also be competent evidence of the statements made by the insured concerning his symptoms. It is well settled that statements made to a physician for the purpose of receiving medical advice are not excluded by the hearsay rule: *Roberts v. Pitt Publishing Co.*, 330 Pa. 44, 48; *John v. Reick-McJunkin Dairy Co.*, 281 Pa. 543, 547; *Eby v. Travelers Ins. Co.*, 258 Pa. 525, 536; *Lake Shore & Mich. Southern Ry. Co.*

*v. Rosenzweig,* 113 Pa. 519, 543; *Lichtenwallner v. Laubach,* 105 Pa. 366, 370. We are satisfied, therefore, that the records of these physicians were admissible as documentary evidence in the same manner, to the same effect and subject to the same restrictions as hospital records.

If any doubt exists upon this point it is resolved by the Uniform Business Records as Evidence Act, section 1, which expressly applies to the records of "every kind of business, *profession,* occupation, calling, or operation of institutions, whether carried on for profit or not." (Italics added.) Section 2 provides: "A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." The legislature certainly intended thereby an extension of the old "shop-book" rule, and to make professional records competent documentary evidence under the circumstances set forth. We agree with plaintiff that the Act did not intend to make relevant that which is not relevant, nor to make all business and professional records competent evidence regardless of by whom, in what manner, and for what purpose they were compiled, or offered. We do think, however, that the Act makes competent the records of these physicians as documentary evidence of the matters we have indicated, and that it applies as well to the records of prescriptions prepared by the pharmacist, and to the cardiogram prepared by Dr. Ohlson.

At most, the prescriptions are merely cumulative evidence of the medical treatment received by the insured. They do not establish the fact that the insured took the medicine prescribed, but that medicine was pre-

scribed for him. The pharmacist's records show that these prescribed medicines were obtained by him. The cardiogram, properly identified by the doctor as a record of the insured's heart action, was documentary proof that he followed the direction of Dr. Denison and had such a record made. The fact that it was identified by oral testimony does not destroy its documentary nature, for, as the Act of 1939 recognizes, all records must be similarly identified and the method of their preparation explained by the testimony of witnesses.

Plaintiff objects that the memoranda, or records of the physicians do not have a separate status as documentary evidence because the doctors themselves testified to the facts appearing therein, and used the records to refresh their memories. The fact that the person who made the records was, in each case, available to testify does not eliminate the basis for the admission of the written proof. As pointed out by Dean John Henry Wigmore in the most recent edition of his work on Evidence (section 1421), documents may be admitted in proof of facts to which the writer of the document could be called to testify, where the circumstances indicate that his recollection would be less reliable than the notations made by him at the time the events occurred. "The assertion may be such", the learned author states, "that we cannot expect, again or at this time, to get *evidence of the same value* from the same or other sources." And his observation relative to hospital records (section 1707) is equally applicable to busy physicians in private practice: "Moreover, amidst the day-to-day details of scores of hospital cases, the physicians and nurses can ordinarily recall from actual memory few or none of the specific data entered; they themselves rely upon the record of their own action; hence, to call them to the stand would ordinarily add little or nothing to the information furnished by the record alone." In *Loder v. Metropolitan Ins. Co.*, supra, and *Baxter v. New York Life Ins. Co.*, supra, physicians

gave oral testimony based upon hospital records which were offered in evidence and received as documentary proof. See *Wallace v. Pennsylvania R. R. Co.*, 222 Pa. 556.

The uncontradicted, documentary evidence produced in this case that the insured had frequent consultations with a number of physicians; that one of these doctors prescribed digitalis for him, which he obtained from a pharmacist; that another had also given him a heart stimulant; that he had a cardiogram made of his heart action upon the advice of a physician; and that he had died of a heart disease within a period of less than a year after making the application here in question, established unequivocally the making of absolutely false representations by the insured under circumstances in which it could not be inferred that he acted in good faith. The case, therefore, is within the rule of the *Evans* decision, and upon that authority judgment n. o. v. should have been entered for defendant by the court below.

The order of the court below is reversed and judgment is here entered for defendant.