Constance A. **STOPPER**

v.

The **MANHATTAN LIFE INSUR-
ANCE COMPANY OF NEW
YORK**, Appellant.

No. 11897.

United States Court of Appeals
Third Circuit.

Argued Sept. 27, 1956.

Decided Jan. 31, 1957.

Rehearing Denied March 5, 1957.

Owen B. Rhoads, Philadelphia, Pa.
(Robert M. Landis, Barnes, Dechert,
Price, Myers & Rhoads, Philadelphia,
Pa., on the brief), for appellant.

John M. McNally, Jr., Philadelphia,
Pa. (James A. Peace, Tompkins & Mc-
Nally, Philadelphia, Pa., on the brief),
for appellee.

Before BIGGS, Chief Judge, and
GOODRICH and HASTIE, Circuit Judg-
es.

HASTIE, Circuit Judge.

This is an action under diversity ju-
risdiction, upon two insurance policies
issued July 19, 1951 by the Manhattan
Life Insurance Company, a New York
corporation, on the life of Eugene Stop-
per, a Pennsylvanian. The insured died
of a heart attack on October 12, 1951.
The insurer denied liability, except for
return of premiums, on the ground that
Stopper had made fraudulent misrepre-
sentations in his applications for insur-
ance, dated July 13, 1951. Trial to a jury
resulted in a verdict for the plaintiff in
the full amount of the policies. Judg-
ment was entered on this verdict after
the trial judge denied defendant's motion
for judgment in accordance with its earli-
er timely motion for a directed verdict.
This appeal followed.

The appellant urges that the
court below erred in leaving to the jury
the decision whether certain unquestion-
ably false statements in the insurance
applications were of such fraudulent
character as to vitiate the policies thus
obtained. The parties properly recog-
nize that this issue is to be resolved in
accordance with Pennsylvania law, since
this is a diversity case brought in a dis-
trict court in Pennsylvania. Croll v. John
Hancock Mut. Life Ins. Co., 3 Cir., 1952,
198 F.2d 562.

The applications for insurance contain-
ed the following questions and answers

upon which insurer rests its claim of fraudulent misrepresentation:

"Part 1 * * *

* * * * * *

"7(b). Is any application or reinstatement, pending or contemplated in any other company? (Give details).

"[Answer] No.

"Part 2 * * *

* * * * * *

"13. Have you ever been examined for or made application to any life, health, or accident insurance company or have you any application pending on which a policy has not been issued * * *?

"[Answer] No.

* * * * * *

"16(b). Have you ever suffered from any ailment or disease of the Heart, Blood Vessels or Lungs?

"[Answer] No.

* * * * * *

"19. What * * * Physician or Physicians have you consulted or been treated by, within the last five years? (Give details below).

"[Answer] Dr. Daniel Pearson [sic] 1830 Delancey.

"Goes twice yearly to Dr. Pearson for physical examinations—No illness."

The insured also certified that he had read the answers to the questions in Part 1 and Part 2 before signing and that they had been "correctly written as given by me, and are full, true and complete and there are no exceptions to any such answers other than stated herein."

Undisputed documentary evidence establishes the basic facts concerning Stopper's answer to the last of the foregoing questions, the inquiry about medical consultations and treatments during the last five years. In answering that question Stopper reported his routine semi-annual physical check-ups by his personal physician Dr. Pierson, but saw fit to omit any mention of six unusual visits to his personal physician since the last semi-annual check-up and within the ten weeks immediately preceding his application to Manhattan for life insurance. Indeed, one such medical visit was made only two days before the execution of the insurance application and an appointment was then made for another visit which occurred the very day of the insurance application. On these occasions he reported distress and discomfort suffered in connection with recurring and rather dramatic symptoms of malaise. In our judgment the character of these symptoms, their frequent recurrence and the steps taken by the attending physician were such that no rational person in Stopper's position could have regarded this recent medical history as too inconsequential to report to an insurance company concerned with the application of a 66 year old man for life insurance. This conclusion is predicated upon and required by Dr. Pierson's written record of this patient's visits as introduced into evidence in this case. Because we regard that record as decisive, we set it out verbatim:

"[Dr. Pierson's Clinical Record]

"5–3–51 In Harrisburg three weeks ago walked about four blocks. After eating heavy dessert of some apple cake and had all gone feeling in epigastrium dyspnea and sweating requiring sitting to rest a while before going to a meeting. This occurred once since after walking. And mildly several times unassociated with activity except that during these three weeks things have been very busy and rather tense.

"Blood Pressure 155/90 Heart O.K. at 76. No murmurs. Chest O.K. ECG. shows within N [i.e., normal]. Urine negative except for faint trace albumin. Rx Thiamine chloride 10 mgm. p.c.

"5–28–51  X-ray of chest 5/26 =Dilation and elongation of aorta. No cardiac enlargement. Conference with Mr. Weaver and Mr. — cardiogram and x-ray report given them.

"6–11–51  Epigastric discomfort, then precordial pain, sense of choking and dull heaviness left arm come shortly after breakfast and 1–2X last week at other times of day. Sounds like angina but doesn't accompany exercise, etc. Blood pressure 140/80. (Belched several times while here.) To stop coffee in A.M. and to get Master 2 step test at hospital.

"6–14–51  E.C.G. and Master 2 step at Lankenau Hospital show slight S.T. sag in some of chest leads returning to N [i.e., normal] in 6 minutes. Has stopped coffee in A.M. and more comfortable tho has had small A.M. attack of short duration. Admits tension in new project. Recheck one week and Rx aminophylline if further symptoms.

"6–21–51  Attack yesterday, shortly pt. lunch lasting about two hours. Then O.K. since. Feels some precordial discomfort today. Blood pressure 140/85. Heart regular 72. Rx. aminophylline gr. iii t.i.d. [i.e., grains 3, 3 times daily]. Nitroglycerine grains 1/100 under tongue p.r.n. [if needed for pain].

"7–11–51  In Cape May 10 days and felt well. Took nitroglycerin four times. Returned Philadelphia yesterday and had attack this A.M. requiring nitroglycerin. Blood pressure 140/85. Heart modal. Rx same and check in two days and consider Kehlen Therapy.

"7–13–51  Has been better but still aware of precordial discomfort. Blood pressure 130/80. Heart physiologic. Rx. nitroglycerin p.r.n. [i.e., as needed]. Eskel 40 millograms. No. L. Start one at bedtime and build to 3 a day unless nausea."

To offset this record it has been argued to us that other evidence shows that Stopper may not have known that his symptoms indicated any heart ailment. If this argument has any validity, it is still beside the point. Stopper's six visits to his physician within a short period and the dramatic, painful and recurring symptoms which he reported on these occasions are the clearest manifestations of his own realization that something out of the ordinary was wrong. And though Dr. Pierson may not have stated any particular diagnosis to the patient, the doctor's prescriptions and the tests he ordered must have made it obvious to Stopper that the doctor was not dismissing the illness as inconsequential. We have not overlooked an additional contention that Stopper may have considered his symptoms no more than dispepsia which he had experienced previously. We simply think this suggestion cannot be squared with Dr. Pierson's record of what was said and done.

In addition, the fact that Stopper considered even his routine semi-annual visits to his physician for check-ups important enough to report on his insurance application makes it unthinkable that he could in good faith have ignored his six most recent and most unusual visits for treatment for recurring visceral pain, reporting instead, "no illness". Thus, on the documentary record alone we have a clear picture of willful misrepresenta-

tion in answer to Manhattan's inquiry about recent medical consultation and treatment.

Appellee's brief properly recognizes that under the law of Pennsylvania, as applicable to a case like this, the trial court should direct a verdict for the insurer "if the uncontradicted documentary evidence shows that statements in the application were false and that insured either knew they were false or otherwise acted in bad faith in making them." This principle is clearly stated in the much cited and often followed case of Evans v. Penn Mut. Life Ins. Co., 1936, 322 Pa. 547, 186 A. 133. For present purposes it is noteworthy that under this authoritative doctrine the knowledge of the insured that he is making a false statement itself establishes the bad faith on the basis of which a verdict must be directed. This is such a case, since the documents in evidence make it clear that the insured must have known that he was withholding the more recent and significant part of the information requested concerning medical consultations and treatment while volunteering less current and significant data.

While each case in this area must depend upon its peculiar facts, we think the Pennsylvania decisions with reference to the withholding of information about recent medical visits indicate by analogy the propriety of directing a verdict for the insurer in the present case. Cf. Kizirian v. United Benefit Life Ins. Co., 1956, 383 Pa. 515, 119 A.2d 47; Freedman v. Mutual Life Ins. Co., 1941, 342 Pa. 404, 21 A.2d 81, 135 A.L.R. 1249; Reeder v. Metropolitan Life Ins. Co., 1941, 340 Pa. 503, 17 A.2d 879; Bailey v. Pacific Mut. Life Ins. Co., 1939, 336 Pa. 62, 6 A.2d 770. Nor is Burton v. Pacific Mut. Life Ins. Co., 1951, 368 Pa. 613, 84 A.2d 310, relied upon by appellee, inconsistent with this analysis. For there the insured did disclose visits to physicians in connection with a tonsillectomy, and the evidence permitted the conclusion that he was unaware that he had experienced anything beyond postoperative treatment consequential to that

surgery. Moreover, this court, applying Pennsylvania law, has required a verdict for the insurer in cases rather similar to the one now on appeal. Guardian Life Ins. Co. of America v. Clum, 3 Cir., 1939, 106 F.2d 592; Croll v. John Hancock Mut. Life Ins. Co., 3 Cir., 1952, 198 F.2d 562.

In summary, we find wholly applicable to the facts before us the statement of the Supreme Court of Pennsylvania in Freedman v. Mutual Life Ins. Co. of New York, supra, 342 Pa. at page 409, 21 A.2d at page 84:

"* * * Thus, where it is established by uncontradicted documentary evidence that the insured has consulted physicians so frequently, or undergone medical or surgical treatment so recently, or of such a serious nature, that a person of ordinary intelligence could not have forgotten these incidents in answering a direct and pointed question in an application for insurance, bad faith may be inferred as a matter of law if the insured denies in his answer that any physician has been consulted, or any medical or surgical treatment has been received during the period of inquiry."

While the knowingly false statement of the insured concerning the nature and frequency of his recent visits to Dr. Pierson was in itself a sufficient ground for directing a verdict for the insurer, we find it equally clear that Stopper made a willfully false statement in answer to an inquiry about other insurance applications. It will be remembered that question 13 in Part 2 of the Manhattan application read as follows: "Have you ever been examined for or made application to any life, health or accident insurance company or have you any application pending on which a policy has not been issued?" Stopper's answer was "No". The falsity of this statement is proved by a document in evidence in this case, namely, an application to the Pan American Life Insurance Company for life insurance in the amount of $50,000 signed by Stopper and dated June 5, 1951,

on which, admittedly, no policy had been issued. Standing alone this document would suffice to establish Stopper's awareness of a circumstance he was required to disclose in this Manhattan application executed five weeks later on July 13, 1951.

In an effort to excuse Stopper's failure to disclose this Pan American application, plaintiff below introduced evidence that Stopper had needed $100,000 of life insurance for business purposes and, with that in view, had signed various but unspecified insurance applications in blank. This is said to provide a basis for a permissible inference that the Pan American application was one of those signed in blank and that Stopper did not know of the submission of the Pan American application when he executed his subsequent application to Manhattan. This argument fails because it ignores Part 2 of the Pan American application which lists answers given by Stopper to the medical examiner of the Pan American Insurance Company concerning his medical history. It appears on the face of the document, and by corroborating testimony as well, that Stopper executed this portion of the application in the presence of the Pan American medical examiner on June 5, 1951. On the record, therefore, Stopper's denial that he had "ever been examined for or made application to any life, health or accident insurance company" without obtaining a policy or that he had "any application pending on which a policy has not been issued * * *" must stand as willfully false. The question was in alternative form and he must have realized that the Pan American application was covered by at least one of the stated alternatives. Cf. Blough v. Modern Woodmen of America, 1946, 159 Pa. Super. 249, 48 A.2d 37; Matovich v. Mutual Benefit Health & Accident Ass'n, 1945, 157 Pa.Super. 604, 43 A.2d 648.

It is our conclusion that the documentary evidence so palpably disclosed the perpetration of a fraud upon the insurer that the direction of a verdict for the defendant was the only course consistent with law and justice. We are confident that the courts of Pennsylvania would reach the same conclusion on these facts.

The judgment will be reversed with instructions to enter judgment for the defendant.