## Wilson Estate (No. 2)

*George B. Ritchie*, for executor.
*James P. Harris, Jr.*, for claimant.

SELECKY, P. J., September 22, 1959.—The single matter before the court in this proceeding is the claim of Dr. Donald B. Lewis for medical services rendered decedent during her lifetime, after a hearing in accordance with our previous decree of March 25, 1959.

The basic problems involved in this matter are the frequently recurring questions of the disqualification of a witness under the so-called dead man's rule, as laid down in the "Dead Man's" Act of May 23, 1887, P. L. 158, sec. 5, 28 PS §322, and the effect of the Uni-

form Business Records as Evidence Act of May 4, 1939, P. L. 42, 28 PS §91(a), et seq., and the so-called "shop-book rule" thereon.

It is clear that the statute of May 23, 1887, above cited, disqualified claimant, Dr. Donald B. Lewis, from testifying not merely as to any transaction with Stella A. Wilson before her death, which occurred on September 28, 1956, but even to any fact which occurred after her death, which would preclude even his identification of his handwriting in his office records. Swieczkowski v. Sypniewski, 294 Pa. 323, 328 (1928), states it thus: "That an interested party is generally incompetent for all purposes [as to facts prior to the death of the decedent] . . . is accepted without discussion [citing cases]."

In the instant case, there was no question in the mind of the court or of counsel that Dr. Donald B. Lewis was disqualified from testifying as to facts occurring during the lifetime of decedent, to whom he rendered medical services. It would appear that all the parties, including claimant and the executor in the estate, Robert J. Doran, himself an attorney, were in agreement that certain medical services were performed, but the dispute lay as to whether or not the services had been paid in full by decedent, prior to her death and by the executor's check for $758 delivered to claimant on November 8, 1956, after the death of decedent on September 29, 1956.

When claimant, Dr. Donald B. Lewis, took the stand to identify certain entries in a series of books which he called his business records, no objection to this identification nor to his explanation of the method he used to prepare his book entries was presented to the court by the executor nor his counsel. Evidently, the executor, himself a lawyer, and his counsel felt that they could prove, by the use of the doctor's own records, that the doctor had submitted certain bills and receipts

during the lifetime of decedent and after her death which would tend to prove that he was paid in full, and that an examination of the books would reveal that any further claim could not be sustained. In their anxiety to cross-examine the doctor about these bills, receipts and books, as to whether the bill was actually paid in full, apparently the executor and his counsel unwittingly opened the door to claimant to testify, and by their extensive cross-examination of claimant and his books, and about all phases of his treatment of decedent, they waived their right to object to the witness's disqualification from being able to identify and qualify his own records. After a careful examination of the doctor's books did not reveal that the doctor's total bill for his services was paid in full, then, at the second day of the hearing, the executor's counsel objected to the use of the books for the first time, apparently finding that the books were not to his expectation or liking.

It is clear that the executor and his counsel could not use the doctor's own records to disprove his claim, and then failing in that, move to strike this testimony from the record. This rule is clearly stated in Dean v. Warnock, 98 Pa. 565 (1881), at page 569, thus:

". . . But the objection to his competency came too late. He was permitted to testify fully in chief to the facts which he was called to prove. It was not until he was partially cross-examined, that any objection was raised. The defendants must have known in the outset the ground of objection which they interposed after they heard what the witness had to say. They cannot thus be permitted to take the chance of obtaining testimony favorable to themselves, and then, upon discovering that it is against them, ask to have it excluded. The testimony in itself was both competent and relevant. If there was a valid objection to the competency of the witness by whom it was delivered, it

should have been interposed at the proper time. Not having been done then, it should be considered as having been waived."

Of course, this case was decided prior to the above cited Act of 1887, but the principle stated therein applies with full force to the Act of 1887, as indicated in O'Bold's Estate, 221 Pa. 145, 147 (1908) ; Heller v. Fabel, 290 Pa. 43, 50 (1927) ; Mack's Estate, 278 Pa. 426, 431 (1924).

At the second day of the hearing, the executor's counsel moved to strike the doctor's testimony from the record, citing Stoneroad Estate, 19 D. & C. 2d 493 (1959), wherein the court indicated that under the Uniform Business Records as Evidence Act of 1939, the requirement is that the person who qualifies the records must himself be a qualified witness, because section 2, 28 PS §91(b), of the act reads:

"A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

There was no question that the physician's records were proper records under the Uniform Business Records as Evidence Act, because all of his books were proper records of all of his services not only to this decedent but to all of his patients, which entries were made in the regular course of his business at or near the time of the act, condition or event, and the sources or information and the methods of preparation were such as to justify its admission. Their objection was to the fact that the physician, himself a disqualified witness, was allowed to qualify these records and identify his handwriting. The executor, in his anxiety

to prove from the physician's own records that his several bills were incorrect and that he had actually been paid in full, made full use of these records for his own case, without objecting to the physician's testimony as to how he prepared this record, thereby resulting in a waiver of any right to object later, after the executor found that he could not disprove the physician's bill, so that his late motion to strike out all the evidence cannot be sustained at this time. Once the records are in evidence, if they prove harmful to the executor, it is too late for him to move to strike them from the record.

The Stoneroad Estate decision above clearly indicates that the "shop-book" rule, which allowed, as an exception to the hearsay rule, records of a merchant or other person for goods delivered to be introduced into evidence after the death of decedent, was never extended to include records of a physician's or other professional services, because of the difficult problem of evaluating professional services. The Uniform Business Records as Evidence Act, cited above, does definitely include physician's records, but these must be properly qualified by a properly qualified custodian or qualified witness. Obviously, if the physician himself is disqualified under the dead man's rule, by virtue of the Dead Man's Act of 1887, above cited, he is precluded from testifying not only as to the services he rendered but also from qualifying his books as evidence.

The rationale of the Uniform Business Records as Evidence Act is well stated in 6 U. of Pitts. Law Rev. 16 by John A. Metz, Jr., as follows:

"The Big Business Rule

"In recent years, the great increase in and the complexity of modern business have compelled, owing to practical inconvenience and unavailability of witnesses, a relaxation of the stringent rules of evidence

respecting the introduction of book entries. The result has been the development of what amounts to still another exception to the Hearsay Rule applicable exclusively to the records of modern 'big business' and aptly referred to as the Big Business Rule.

"This rule permits the introduction in evidence of records of large businesses when produced and verified as the books of regular entry of the company by a supervising officer knowing them to be such, even though they were not made by him and he has no knowledge of the truth of the facts recorded therein, without the necessity of producing either the numerous bookkeepers who acted as entrants or the even more numerous salesmen and shipping clerks who were the transactors of the facts recorded."

As our Supreme Court has indicated in McKeehan Estate, 358 Pa. 548 (1948), at 552:

". . . since they [the records] were made contemporaneously with the acts to which they purport to relate, they were made under circumstances which suggest no motive for falsification and they were made by persons having knowledge of the facts set forth [citing cases]."

It is this "ever present possibility of fraudulent, self-serving entries" which made the courts hesitate to extend the so-called "shop-book" rule from tradesmen for goods sold to professional men for the value of their services. See Freedman v. The Mutual Life Insurance Company of New York, 342 Pa. 404, at 413 (1941). When several employes make these entries in the ordinary course of their business, the Uniform Business Records as Evidence Act indicates that this motive for falsification disappears. Accordingly, this must be considered a signal to the owner of a "one-man business" that this act does not consider the "motive for falsification" removed sufficiently so as to qualify business records when made by claimant himself in his

claim against a decedent. It would appear that the proprietor of a one-man business, who keeps his own records in his own handwriting, will still run against the stone wall of the dead man's rule, in that he is not a qualified "custodian or other qualified witness" so as to qualify his records. The person to qualify the record must be someone else who is not silenced by the dead man's rule, such as a secretary or other employe. This may prove to be a hardship on one-man business enterprises, or on a professional man who keeps his own records, but until the legislature grants the courts more authority to allow the one-man custodian of his business records to testify, so as to lay some basis to determine the lack of any motive for falsification, which might enable these records to be admitted, then the courts are powerless to allow such one-man records to qualify under the Uniform Business Records as Evidence Act above cited.

It is interesting to note that the only other witness for claimant was his wife. Having ruled that these records are competent, because the objection thereto was made entirely too late, after all of the evidence was in and after extensive cross-examination of the records and the witness, and court hereby indicates that, since the reasoning for the disqualification of the wife of a disqualified witness is the "identity of interest of husband and wife", it would appear that a waiver of objection as to one is also a waiver as to the other: White's Estate, 2 Dist. R. 808 (1893); 2 Hunter, Pa. Orphans' Court Commonplace Book, 2nd ed., §1 (e), p. 239.

The executor then argued that the acceptance by the doctor of executor's check for $758, after decedent's death, effected an accord and satisfaction. The testimony of the doctor, elicited by the executor and his counsel in cross-examination, was to the effect

that when the doctor presented his bill to the executor, the executor indicated that there appeared to be some duplication, and that if he, the doctor, would render a bill for $758 it would be paid, since the legatees agreed upon this, and the doctor should file a claim for any balance, as stated by the executor, an attorney, on the record: "I told him (the doctor) not only orally, but I told him in writing to file the claim if he wanted anything over and above that $758.00 which I paid him—I had plenty of money in this estate—I had over a million dollars in my possession and it wasn't a question of amount—I could have paid him $1,700.00 or $2,700.00 if I thought his evidence . . .".

In order to be an accord and satisfaction, there must be consideration for the acceptance by a claimant of a lesser amount than his claim: Nies v. Metropolitan Casualty Insurance Company of New York, 317 Pa. 545 (1935). No such consideration was shown here when the doctor accepted a lesser amount. In fact, the executor directed the doctor to file a formal claim for any balance allegedly due, which he did. This is not accord and satisfaction: Brush Hat Mfg. Co. v. Albeles, 45 Pa. Superior Ct. 243 (1911).

Apparently what gave rise to the executor's contention was the fact that the doctor gave to decedent's business agent, during decedent's lifetime, a bill for $404 dated February 12, 1956, which was paid by decedent in her lifetime. The executor, upon finding this receipt, apparently assumed that all medical services to the date of the bill, February 12, 1956, were paid in full. At the hearing, however, the executor's own cross-examination elicited the doctor's satisfactory explanation that, although the bill was dated February 12, 1956, it was for services rendered only to December 31, 1955, as specifically requested by decedent's business agent for income tax records for

the calendar year 1955, and then the executor's further cross-examination revealed considerable medical services rendered between December 31, 1955, and February 4, 1956, during part of which time decedent was hospitalized, which gave rise to another bill for approximately $1,100. Subsequent bills rendered by the doctor wrongly gave credit for this $404 payment twice, so that the several bills rendered by the doctor in different amounts naturally gave rise to doubt in the executor's mind, who then rightfully demanded proof at the hearing. Once the executor, however, cross-examined defendant and his books at length, he waived the disqualification of claimant to testify, and elicited the explanation from claimant himself that certain moneys were owed the doctor.

An examination of these bills, however, reveals that the doctor did later submit a subsequent bill in which he included a lump sum of $400 for services which he stated were in his books but which he did not render in his first bill. The doctor testified that this $400 lump sum was "not recorded or charged (but) made on a friendship basis, total value of work done, estimated at $400.00". The doctor's records on these items were sparse and did not show that these charges were recorded at the time they were made, but, in fact, indicated that many of these items were inserted some time later. Accordingly, the court finds that the testimony to support this $400 part of the doctor's claim of $1,019 is so sketchy and so unsupported that it does not warrant credibility, and that portion of the doctor's claim is hereby disallowed, leaving the balance of the bill of $1,019, namely $619, as a valid claim against the estate.

Accordingly, the court, after ruling that the doctor's records were admitted into evidence, without objection from the executor or his counsel, who then moved

to strike it from the record only at the close of the testimony, when it was too late, the court hereby enters the following

### Decree

That the claim of Dr. Donald B. Lewis for medical services rendered decedent during her lifetime in the sum of $1,019 is disallowed to the extent of $400, which was not properly proven, but that the remaining claim in the sum of $619 is hereby allowed and the executor is directed to make payment accordingly.