

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-30-2005

# NW Mutl Life Ins Co v. Babayan

Precedential or Non-Precedential: Precedential

Docket No. 04-3521

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"NW Mutl Life Ins Co v. Babayan" (2005). *2005 Decisions.* Paper 174.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/174

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-3521

———

THE NORTHWESTERN MUTUAL
LIFE INSURANCE CO.

v.

KATHLEEN L. BABAYAN

D.C. Civil Action No. 03-cv-00717

KATHLEEN BABAYAN

v.

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY;
JOSEPH M. SAVINO, GENERAL AGENT
NORTHWESTERN MUTUAL
FINANCIAL NETWORK A/K/A
AND D/B/A THE SAVINO
FINANCIAL GROUP; THOMAS GALLINA

D.C. Civil Action No. 03-cv-01622

Kathleen L. Babayan,

Appellant

────────

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 03-cv-00717 and 03-cv-01622)
District Judge: Honorable Michael M. Baylson

────────

Argued October 26, 2005

Before: SLOVITER, FISHER, and GREENBERG, *Circuit Judges*.

(Filed November 30, 2005)

David S. Senoff (Argued)
Billet & Connor
2000 Market Street, Suite 2803
Philadelphia, PA  19103
        *Attorney for Appellant*

Daniel J. Zucker (Argued)
260 South Broad Street, Suite 1200
Philadelphia, PA  19102
        *Attorney for Appellee,*
        *Northwestern Mutual Life Ins. Co.*

Charles W. Craven (Argued)
John P. Penders
Marshall, Dennehey, Warner,
 Coleman & Goggin
1845 Walnut Street, 16th Floor
Philadelphia, PA  19103
       *Attorneys for Appellee,*
       *Thomas Gallina*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

For the third time in the past four years, we are asked to determine whether summary judgment was properly granted in favor of an insurer on the basis that an insurance applicant's material omissions on an application constituted bad faith as a matter of law and rendered the policy void ab initio.  *Compare Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517 (3d Cir. 2004), *with Burkert v. Equitable Life Assur. Soc. of America*, 287 F.3d 293 (3d Cir. 2002). Appellant Kathleen Babayan argues that our recent decision in *Justofin* created a "bright-line" rule that bad faith can never be inferred as a matter of law if the applicant provides some relevant medical information, but fails to provide complete information.  We decline to adopt Babayan's proposed bright-line rule in this case.  The record contains incontrovertible documentary evidence that Babayan omitted information in bad faith, and there is no relevant relationship between the information Babayan provided on her application and the specific information she omitted.  Accordingly, we will affirm the

3

judgment of the District Court that Babayan's omissions on her insurance application constituted bad faith as a matter of law.

We also reject Babayan's remaining grounds for appeal. We conclude that the District Court did not err in granting summary judgment in favor of Appellee Northwestern Mutual Life Insurance Co. ("Northwestern") with respect to Babayan's novel bad faith claim premised upon Northwestern's "post-claim underwriting" practices. In addition, we hold that the District Court did not err in granting summary judgment in favor of Babayan's insurance agent, Thomas Gallina, as to Babayan's negligence claim because Gallina's actions did not cause Northwestern to rescind Babayan's policy.

## I. Background

### A. The Application Process

After missing six days of work because of Bell's Palsy Disorder in late December 2000, Babayan decided to obtain disability income insurance. In January 2001, Babayan telephoned Gallina's insurance agency. Shortly thereafter, Gallina met with Babayan at her office in New Jersey. During this meeting, Babayan provided Gallina with general, personal information for Gallina to use in preparing a specific insurance proposal. Several weeks later, on February 11, 2001, Gallina presented his proposal to Babayan.

Babayan agreed to go forward with the application process and filled out a disability insurance application and a nonmedical questionnaire. Each of the documents required Babayan to respond to a number of specific questions that required either a "yes" or "no" response. Gallina verbally asked Babayan each question, then recorded her response on the application and the nonmedical

4

questionnaire. Gallina testified at his deposition that he read the questions from the documents verbatim.

The crux of the dispute between the parties is the interaction between Gallina and Babayan at the February 2001 meeting, particularly Babayan's "responses" to two of the questions. Question 14.K.2 of the disability insurance application asked:

> In the past 5 years, has the Insured been in a motor
> vehicle accident, has the Insured been charged with a
> moving violation of any motor vehicle law, or has the
> Insured's driver's license been restricted, suspended,
> or revoked?

Babayan does not dispute that Question 14.K.2 was answered "no" on the insurance application. Neither does Babayan dispute that the answer to Question 14.K.2 is false. According to Babayan, she informed Gallina that she had previously been involved in a motor vehicle accident and a slip-and-fall accident in 1995 or 1996.[1] Babayan claims that Gallina told her not to disclose the incidents because "that's far enough away." Gallina allegedly told her, "I don't think it will be a problem, but when you sign the medical waiver, they go get your records from your doctors and they'll find out that stuff." Thus, Babayan asserts that she acquiesced in Gallina's advice to mark "no" on the application.

In addition, Babayan answered "no" to Question 33.k of the nonmedical questionnaire, which stated: "In the last 10 years, have

---

[1]With her memory refreshed at her deposition, Babayan acknowledged that she had been in a motor vehicle accident on September 24, 1996, within five years of the February 11, 2001 date she submitted her application.

you had, been told you had or been treated for: Arthritis, sciatica, gout, or any disorder of the muscles, bones, joints, spine, back or neck?"[2]  There is no evidence in the record that Babayan asked Gallina any questions relating to Question 33.k, or that Gallina gave Babayan any advice on how to answer the question.

After Gallina finished filling out the questionnaire in response to Babayan's answers, Babayan signed both the insurance application and the nonmedical questionnaire.  Each of the documents contained certain representations above the signature line.[3]  By signing the

_____

[2]Northwestern argued in its motion for summary judgment that Babayan's false responses to Questions 36 and 37 also constituted bad faith as a matter of law.  The District Court, however, rejected that argument, stating that: "Babayan's answers to questions 36 and 3[7] appear to call for more subjective answers, such that inconsistencies in responses might not incontrovertibly establish bad faith, as a matter of law."  Because the District Court did not rely upon Babayan's answers to these questions in its opinion, we need not examine these discrepancies in detail.

[3]Babayan's insurance application contained the following representation:

> The Insured consents to this application and declares that the answers and statements made on this application are correctly recorded, complete and true to the best of the Insured's knowledge and belief. Answers and statements brought to the attention of the agent, medical examiner, or paramedical examiner are not considered information brought to the attention of the Company unless stated in the applications. Statements in this application are representations and

6

application and the nonmedical questionnaire, Babayan represented that her answers on both forms were truthful and accurate.

The answers contained on the insurance application and the nonmedical questionnaire set forth above, however, were false. Babayan was in an automobile accident on September 24, 1996, within five years of the date she submitted her insurance application. In addition, Babayan was treated by several physicians between 1996 and February 2001 for neck, back, hip, leg, and knee pain resulting from her automobile accident, as well as a separate slip-and-fall accident in July 1996. Babayan acknowledged in her deposition that the answer to Question 33.k was false; she stated, however, that she thought that the word "disorder" meant "disease." Babayan further testified that had she read Question 33.k at the February 11, 2001 meeting with Gallina, she would have asked Gallina to explain what the question meant to clear up any misunderstanding. She claims that if Gallina had told her that Question 33.k referred to "treatment for ongoing problems," she would have answered "yes" based upon her "new understanding."

Babayan asserts that written notes she took during her February 11, 2001 meeting with Gallina confirm her version of the events. Additionally, Babayan stated that Gallina told her she would have to sign a waiver authorizing Northwestern to obtain her medical records. Babayan signed the authorization for release of her medical

---

not warranties.

Similarly, the nonmedical questionnaire contained the following representation above the signature line: "I declare that my answers and statements are correctly recorded, complete, true to the best of my knowledge and belief. Statements in this application are representations and not warranties."

7

records, and she informed Northwestern on the nonmedical questionnaire that Dr. Joseph Kipp was her primary care physician.

## B. Paramedical Examination

On February 13, 2001, a paramedical examiner took Babayan's blood pressure and asked her some further questions about her medical history. Several of the questions the examiner asked Babayan were identical to questions she had previously answered in her meeting with Gallina. Babayan testified at her deposition that she did not remember specific questions the examiner asked her, although she stated that the examiner "must have asked me obviously at least some of them." One of the questions the examiner asked Babayan was Question 33.k. As in her prior answer on the nonmedical questionnaire, Babayan answered "no" to Question 33.k on the paramedical questionnaire.[4] Babayan testified at her deposition that she did not read the paramedical questionnaire before signing it. She further stated that if she had read the responses marked by the examiner, she would have realized the answers were incomplete and inaccurate. Despite not reading the answers marked by the examiner, Babayan signed the paramedical questionnaire, thereby representing that her answers and statements were "correctly recorded, complete, and true to the best of [her] knowledge and belief."

After receiving Babayan's application, nonmedical questionnaire, and paramedical questionnaire, Northwestern underwriter Cynthia Guss approved Babayan's policy on March 3, 2001. Guss did not obtain any of Babayan's medical records at the time because she "didn't feel that the medical history provided

[4]Questions 31-42 of the paramedical questionnaire were identical to questions 31-42 on the nonmedical questionnaire completed by Gallina.

warranted medical records being ordered." In addition, Guss testified at her deposition that the inconsistencies in Questions 36 and 37 did not merit ordering Babayan's medical records.[5] After the application was approved, Gallina delivered the policy to Babayan in March 2001. The effective date of the policy was February 13, 2001, the date Babayan underwent the paramedical examination.

## C. Subsequent Illnesses and Rejection of Claim

Beginning in March or April 2001, Babayan started suffering from fatigue, pain, headaches, and an inability to concentrate. Dr. Kipp gave Babayan a preliminary diagnosis of fibromyalgia. Over the course of the next ten months, Babayan sought treatment from Dr. Kipp and a number of other physicians for her symptoms. In February 2002, Babayan applied for and received short-term disability income payments from the State of New Jersey.[6]

On March 23, 2002, approximately one year after her symptoms began, Babayan applied for disability benefits under her insurance policy. Northwestern assigned disability benefit specialist

---

[5]Regarding Question 36, Babayan told the examiner that she saw Dr. Kipp for a virus in January 2001. Guss stated that she did not view a virus "as being something that would cause an extended disability, keep one from preventing to work at their own occupation for any significant amount of time." Regarding Question 37, Guss concluded that Babayan's answer did not merit further inquiry because Babayan said she only missed six days of work due to Bell's Palsy virus.

[6]Although a resident of Pennsylvania, Babayan worked in New Jersey and was entitled short-term disability benefits pursuant to New Jersey law.

9

Lisa Duller to review Babayan's claim. Duller testified in her deposition that she made the decision to institute a "constestability" review of Babayan's claim because company policy provides that such a review is automatically performed if a claim is filed within two years of the application date. Babayan's application caused Duller to request certain information from Babayan, including an "Attending Physician's Statement" from Dr. Kipp. Dr. Kipp completed the statement, indicating that he had diagnosed Babayan with fibromyalgia, depression, chronic pain, and cognitive dysfunction, and that he had set forth a treatment plan that included pain management and examination by specialists. Duller also requested medical records from all of the doctors identified in Dr. Kipp's records as providing treatment to Babayan.

Thereafter, Northwestern began a more extensive investigation of Babayan's claim. Duller authorized an outside private investigation service to obtain information about Babayan. Furthermore, on May 3, 2002, a Northwestern representative, Jim Porter, interviewed Babayan at her home. During the course of that interview, Porter informed Babayan that her full and complete medical history, including her motor vehicle accident and slip-and-fall accident, had not been reported to Northwestern by Gallina or the paramedical examiner.

In summer 2002, Babayan was diagnosed with Sjogren's Syndrome, an autoimmune disorder, and primary biliary cirrhosis. Babayan advised Northwestern of her new diagnosis, and informed the company that the original diagnosis of fibromyalgia might no longer be applicable.

On July 11, 2002, Duller referred Babayan's file to Steve Kien, an underwriter at Northwestern. Kien's job was to review all of the information in Babayan's file to come to a determination

whether Northwestern would have issued the policy to Babayan based upon the information it received during the contestability review. In a memorandum to Duller dated July 19, 2002, Kien concluded: "Had we been aware of the chronic pain and arthralgias symptoms, extensive treatment history and MRI confirmed disc disease and degenerative changes in the right knee, policy D1408128 would have been declined." Duller made the decision to recommend rescission of the policy on July 26, 2002.

On that same date, Duller sent a memorandum to her supervisor, Sharon Raymond. Duller testified at her deposition that she made the recommendation to rescind the policy based upon Kien's conclusions. Duller further testified that she probably would have recommended that the policy be reformed by adding certain riders to the policy had that been Kien's recommendation. Raymond agreed with Duller's recommendation, and, on August 21, 2002, Duller sent a letter to Babayan rescinding her policy. Duller enclosed a check totaling Babayan's premium payments, plus interest, and informed Babayan that by cashing the check she would release Northwestern from all claims.[7] Babayan did not cash the check.

## II. Procedural History

On February 4, 2003, Northwestern filed a two count complaint alleging misrepresentation and fraud and deceit. Northwestern sought to have Babayan's policy declared void ab initio, to have the policy returned, and to receive costs, fees and other relief. On March 17, 2003, Babayan filed a complaint against Northwestern and Joseph M. Savino. The parties stipulated to

[7]There were two drafts of the final August 21, 2002 letter. Duller testified that the August 21, 2002 letter contained all of the bases for Northwestern to rescind the policy.

consolidate the actions for all purposes, and, pursuant to an additional stipulation, Savino was dismissed with prejudice.

Babayan filed an amended five count complaint on December 24, 2003, against Northwestern and Gallina seeking a declaratory judgment against Northwestern, alleging bad faith denial of insurance benefits and breach of contract against both defendants, and alleging breach of fiduciary duty and negligence against Gallina.[8] Northwestern and Gallina filed motions for summary judgment as to all counts in the complaint. On August 24, 2004, the District Court granted summary judgment to Northwestern and Gallina. The District Court first determined that Northwestern could rescind Babayan's policy because Babayan knowingly made false and material misrepresentations as a matter of law. Because this determination rendered the policy void ab initio, the District Court then held that Northwestern was entitled to summary judgment on Babayan's breach of contract claim. The District Court next concluded that summary judgment was appropriate in favor of Northwestern with respect to Babayan's bad faith claim. Finally, the District Court held that Gallina was entitled to summary judgment as to Babayan's negligence and breach of fiduciary duty claims.[9] As to the negligence claim, the District Court held that Babayan failed to produce sufficient evidence establishing that Gallina owed her a duty of care. In addition (based upon its earlier finding that Babayan's conduct was fraudulent as a matter of law), the District Court held

---

[8]Babayan's amended complaint originally alleged breach of fiduciary duty and negligence claims against Northwestern, as well. Babayan, however, voluntarily dismissed with prejudice those claims on January 7, 2004.

[9]The District Court's determination as to the breach of fiduciary duty claim is not a subject of this appeal.

that Babayan could not obtain contribution for her own willful misconduct as an intentional tortfeasor. Alternatively, the District Court held that Babayan's claims against Gallina were barred by the applicable two-year statute of limitations.

Babayan filed a timely notice of appeal on August 26, 2004. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states (Babyan: Pennsylvania; Northwestern: Wisconsin; Gallina: New Jersey) and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. We have jurisdiction over an appeal from a final order of the District Court pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's entry of summary judgment in favor of Northwestern and Gallina. *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 679 (3d Cir. 2003). We therefore apply the summary judgment standard set forth under Federal Rule of Civil Procedure 56(c). Under that standard, we will affirm the judgment of the District Court "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).

### III. Discussion

### A. Northwestern's Rescission Claim

The initial issue confronting the Court is whether Babayan's answers to Question 14.K.2 of the insurance application and Question 33.k of the nonmedical and paramedical questionnaires were knowingly false or made in bad faith. After reviewing the applicable case law, we conclude that Babayan's answer to Question 14.K.2 did not constitute bad faith as a matter of law. If we were considering

Babayan's answer to Question 14.K.2 alone, we would be required to reverse the judgment of the District Court. We are not, however, and we hold that Babayan's answer to Question 33.k constituted bad faith matter of law for the reasons set forth below.

**1.**

Generally, in order to void an insurance policy under Pennsylvania law,[10] an insurer has the burden of proving, by clear and convincing evidence, the following three factors: (1) the insured made a false representation;[11] (2) the insured knew the representation was false when it was made or the insured made the representation in bad faith; and (3) the representation was material to the risk being insured. *Justofin*, 372 F.2d at 521 (citing *Coolspring Stone Supply, Inc., v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993)). In deciding a motion for summary judgment, the court is required to take the heightened standard of proof into account. *Id.* at 521-22 ("Where the clear and convincing standard applies, the trial judge must inquire whether the evidence presented is such that a jury applying that evidentiary standard could find only for one side.").

The parties do not dispute that the general framework as set forth in *Justofin* governs Northwestern's rescission claim. Nor do they dispute that Northwestern proved the first (falsity) and third (materiality) factors as a matter of law. The dispute centers around

[10]The parties agree that Pennsylvania law applies to the pending appeal.

[11]Under Pennsylvania law, a false representation includes an omission of an insured's medical information. *See Justofin*, 372 F.3d at 522 (citing *Grimes v. Prudential Ins. Co. of Am.*, 585 A.2d 29, 31-32 (Pa. Super. Ct. 1991)).

the District Court's determination that there were no genuine issues of material fact as to whether Babayan's answers were knowingly false or made in bad faith.

**2.**

Two recent decisions of this Court reached contrary conclusions as to whether, at the summary judgment stage, an insurer could obtain a judgment as a matter of law based upon the insured's false misrepresentations in an insurance application. Because of their importance to the pending appeal, we discuss each of the decisions in detail.

In the first decision, *Burkert*, we held that a life insurance policy was void ab initio because the applicant knowingly made materially false misrepresentations in his insurance application. In that case, the decedent, Seth Jamison, applied for a $1 million dollar life insurance policy through Equitable Life. In connection with his application, Jamison was required to state: (1) whether he used narcotics and other drugs within the last ten years; and (2) whether he received medical counseling or medical treatment regarding the use of alcohol or drugs. Jamison answered that he was treated for cocaine abuse in the late 1980s and early 1990s, but that he had "no problems since." *Burkert*, 287 F.3d at 297.[12] We granted summary judgment in favor of the insurer on its rescission claim because the irrefutable evidence revealed that Jamison was undergoing treatment for cocaine addiction with his clinical psychiatrist at the time he filled out the application. *Id.* We rejected the beneficiaries' argument that Jamison's answers were ambiguous, finding that Jamison's

---

[12]Similar to Babayan's application above, Jamison's application contained a representation that his answers were "true and complete to the best of my knowledge and belief." *Id.*

15

"incomplete" answers did not raise a question of fact because "fraud is presumed . . . from knowledge of the falsity." *Id.* (quoting *Coolspring Stone Supply, Inc.*, 10 F.3d at 148). We further stated that an "inference of fraud is irresistible when, for example, unreported illness or disability of the insured was so serious and so recent that he could not have forgotten it." *Id.* (quoting *Evans v. Penn. Mut. Life Ins. Co.*, 186 A. 133, 138 (Pa. 1936)). Accordingly, we held that the beneficiaries' argument that Jamison's answers were simply "incomplete" was "frivolous" in the face of substantial, incontrovertible evidence that Jamison was using drugs and undergoing treatment for drug and alcohol abuse at the time he completed his application. Thus, Jamison's misrepresentations constituted bad faith as a matter of law.

Two years after our decision in *Burkert*, we came to a different conclusion after considering a similar issue in *Justofin* regarding whether an insurance applicant's misstatements in her application constituted bad faith as a matter of law.

Loretta Justofin initially applied for a life insurance policy from MetLife in 1994. In that application, she stated that her son, Dr. Christopher Justofin ("Dr. Justofin") was her personal physician, and that he treated her for occasional arthritis of the hands and feet. *Justofin*, 372 F.3d at 519. MetLife subsequently issued Justofin a life insurance policy in the amount of $100,000. In 1999, Justofin applied to MetLife for additional coverage (up to $300,000). In connection with that process, Justofin was required to complete an additional application. Justofin answered "yes" to two questions on the application: (1) that she had been treated for, *inter alia*, arthritis; and (2) that she had been examined by a physician within the past five years. *Id.* at 519-20. Because Justofin answered "yes" to both questions, the application instructed her to provide further details, including: the name of each physician, the nature and severity of her

16

condition, the frequency of attacks, specific diagnoses, and treatment. *Id.* at 520. Justofin listed the names of several doctors she had consulted for treatment, details of the treatment she undergone, and that she had foot surgery for her arthritis. Justofin, however, did not mention in the application that her son was her physician. In addition, Justofin stated in part B of the application that she had arthritis and that she took Prednisone for her arthritis back in 1969. In part C of the application, Justofin indicated that she had an "unknown" type of arthritis that caused her hands to swell.

After Justofin passed away, MetLife brought an action to rescind her policy on the basis that she knowingly failed to disclose that her son was her physician and that she was prescribed Prednisone. The insured relied upon deposition testimony from Dr. Justofin that he was his mother's personal physician from 1994 until 1998; that he visited his mother weekly during that period to examine her and pick up his mail; that his mother had arthritis (either rheumatoid, osteoarthritis, or both); and that he used to prescibe a six-month supply of Prednisone for his mother's arthritis. *Id.* at 520. We agreed that Justofin made false representations in the 1999 change application because the irrefutable evidence in the record showed that Justofin clearly failed to inform MetLife that she took Prednisone for her arthritis between 1994 and 1998. *Id.* at 522. We disagreed, however, that Justofin's misrepresentations constituted bad faith as a matter of law. We noted the general rule that "an insured's state of mind is an issue of fact for the jury" because "evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ." *Id.* at 522-23. Applying this standard, we held that Justofin's answers in her change application did not incontrovertibly establish her bad faith. In so holding, we stated that there were at least two possible reasonable inferences from the evidence that precluded summary judgment. First, a jury could conclude that Justofin might not have thought that

17

her son's casual visits were important enough to report in her new application because: (a) she had already disclosed in the initial application that her son was her physician; and (b) her son discontinued his weekly visits one year prior to her submitting the change application. *Id.* at 524.[13] Second, as to Justofin's failure to list the type of arthritis she suffered from, and to disclose that she was taking Prednisone to combat her arthritis, we stated that a jury could determine that further detail on the change application was unnecessary because she already listed on her change application that her arthritis was treated, *inter alia*, by surgery.[14] For these reasons, we held that a material issue of fact existed as to whether Justofin answered the application in bad faith.

The crux of the parties' competing arguments on the merits of Northwestern's rescission claim is the proper interpretation of our decision in *Justofin*. Babayan argues that "*Justofin* can be read as creating a bright line rule that where an insured provides some relevant medical information but fails to provide complete information, the question of the insured's intent can not be inferred as a matter of law." In opposition, Northwestern raises two arguments. First, Northwestern argues that "[f]ar from establishing a bright line rule, the *Justofin* court confined its holding to the facts[.]" Second, Northwestern argues that, assuming a bright line rule was created in *Justofin*, that rule is inapplicable under the facts

---

[13]In a footnote, we stated that the 1994 and 1999 applications had to be read together for purposes of determining whether the answers on the 1999 change application were made in bad faith. *Id.* at 522 n.9.

[14]Alternatively, we held that summary judgment was inappropriately granted because there was a genuine issue of material fact as to whether Justofin's representations were material. *Id.* at 525.

of this case because Babayan's own testimony demonstrates that she provided knowingly false answers in the application and questionnaires.

We agree with Northwestern that *Justofin* did not create a bright-line rule; rather, the holding in *Justofin* confirms the importance of analyzing bad faith cases at the summary judgment stage under the particular factual background of each case. *Justofin* and *Burkert* applied the same three-part framework under Pennsylvania law. We decline to extend the specific holding in *Justofin* to a broad bright-line rule, particularly where numerous courts have applied the framework to diverse factual situations over the past sixty years. *Compare Justofin*, *supra*; *Burton v. Pacific Mutual Life Ins. Co.*, 84 A.2d 310, 312 (Pa. 1951) (holding that judgment should not be entered in favor of the insurer because the insured was unaware at the time he applied for insurance that he suffered from incurable throat cancer); and *Grimes v. Prudential Ins. Co. of America*, 585 A.2d 29 (Pa. Super. Ct. 1991) (finding that insured did not act in bad faith when she failed to disclose a liver disorder and hypertension on her application where there was testimony that: (a) the insured's doctor told her that her liver results were "elevated" but normal; and (b) her hypertension was an asymptomatic disorder); *with Burkert*, *supra*; *Freedman v. Mutual Life Ins. Co. of New York*, 21 A.2d 81 (Pa. 1941) (holding that judgment notwithstanding verdict should be entered in favor of insurer where insured answered in his application he had not visited any physicians over the past five years, yet the uncontradicted evidence revealed he had made twenty visits to five physician over the five-year period); *Stopper v. Manhattan Life Ins. Co. of New York*, 241 F.2d 465 (3d Cir. 1957) (relying upon *Freedman*, Court of Appeals found that applicant's withholding of medical information constituted bad faith as a matter of law); *Walsh v. John Hancock Mut. Life Ins. Co.*, 63 A.2d 472 (Pa. Super. Ct. 1949) (holding that trial

19

court properly entered judgment notwithstanding the verdict in favor of insurer on insured's bad faith where evidence revealed that plaintiff withheld from insurance application that he had been hospitalized for cardiac disorder twenty-two days prior to application date); *American Franklin Life Ins. Co. v. Galati*, 776 F. Supp. 1054 (E.D. Pa. 1991) (granting judgment on the pleadings in favor of insurer); and *Monarch Life Ins. Co. v. Donahue*, 708 F. Supp. 674 (E.D. Pa. 1989) (granting summary judgment in favor of insurer).

Against this backdrop, it is clear that the different results in *Burkert* and *Justofin* did not depend on the application of a bright-line legal rule; instead, we applied the same standard, examined the record evidence, and simply came to different conclusions as to whether there was incontrovertible evidence of bad faith. Our decision in *Justofin* did not foreclose the possibility of summary judgment being entered in the bad faith rescission context. In this respect, the current case does not require us to break any new ground. Therefore, we reaffirm that summary judgment may be entered on a rescission claim when, based upon the evidence produced in discovery, the only reasonable inference a fact finder could draw is that the applicant's answers were knowingly false, or made in bad faith.[15]

---

[15]We applied this standard in our decisions in *Burkert* and *Justofin*. Summary judgment in favor of the insurer was appropriate in *Burkert* because the only reasonable inference that could be drawn from Jamison's failure to disclose his extensive history of drug and alcohol abuse and treatment was that his omission was made in bad faith. In contrast, such an inference could not be drawn in *Justofin* on the basis of the record evidence because (as in *Grimes* and *Burton*): (1) it was unclear whether Justofin even knew the type of arthritis she suffered from; and (2) Justofin actually disclosed that she underwent surgery for arthritis, an event she might have thought more significant

Babayan's bright-line approach would create a number of practical problems.  First, the approach ignores that we have to consider each response in the application separately.  Certainly, a number of questions might be similar in an insurance application, generating similar responses.  In that respect, a complete (or partially complete) answer to one question may raise an issue of fact as to bad faith if the applicant answered a similar question differently.  *See Justofin*, *supra*.  However, if a question in an application inquires about a specific health disorder, and the record reveals that the applicant's answer was incontrovertibly false, the applicant should not be permitted to rely upon the fact that she provided information about a wholly unrelated ailment in response to another question in order to create a genuine issue of material fact as to bad faith.  As examined in Section III.A.4 below, this is a principal failure of Babayan's approach.  Second (and related to the first concern), Babayan's approach would relieve the insurance applicant from ever having to answer insurance applications completely and truthfully.  Rather, the applicant could create a smokescreen by providing some evidence of unrelated disorders in response to a specific question and then argue, if the insurer attempted to rescind the policy, that the information provided was not false, but "incomplete."  We decline to adopt a broad standard that would encourage insurance applicants to be less than forthcoming in their applications.  Finally, Babayan's standard contains too expansive a concept of "completeness."  It is imprudent to adopt a rule that signing a waiver for the insurance company to retrieve medical information absolves the applicant of the obligation to provide truthful information.[16]

---

than the particular drug she took after her surgery.

[16]To analogize Babayan's case to *Justofin*, the applicant there answered "yes" to two health-related questions.  Justofin's purported failure to disclose information related to the incomplete information

In summary, we do not find that *Justofin* upset the framework applied by courts considering Pennsylvania law in this context over the past sixty years. Thus, we will consider Babayan's appeal under the existing framework and will not adopt a bright-line approach that would engender more confusion than clarification.

**3.**

Applying the framework to the specific false answers Babayan gave to Northwestern, we agree with Babayan that her answer to Question 14.K.2 did not constitute bad faith as a matter of law. Question 14.K.2 stated:

> In the past 5 years, has the Insured been in a motor vehicle accident, has the Insured been charged with a moving violation of any motor vehicle law, or has the Insured's driver's license been restricted, suspended, or revoked?

Babayan answered "no" to Question 14.K.2. Babayan subsequently acknowledged in her deposition testimony that her answer to Question 14.K.2 was false.

---

she provided in the "Details" section adjacent to her response. Perhaps in that type of situation, a stronger argument could be made for requiring the insurer to investigate further. There, the insurer knows that the applicant suffers from a particular ailment; the issue from the point of view of the insurer would be the severity of the ailment. In contrast, a different situation arises here, where the applicant failed to acknowledge the existence of an ailment in the face of incontrovertible opposing evidence.

22

The issue, however, is whether a fact finder could draw a reasonable inference from the record that Babayan knew at the time she answered Question 14.K.2 that her answer was false, and/or was made in bad faith. A review of the record demonstrates that there is a genuine issue of material fact on this point. For example, Babayan also testified in her deposition that she had the following exchange with Gallina:

> I recall I did talk about the slip and fall and the car accident. I remember I was embarrassed that I had two incidents within three months. I felt like I was a klutz or something. And I told him and he said to me, when was it? I said I can't remember right now. I think it was '96, '95. He said, that's far enough away. I don't think it will be a problem, but when you sign the medical waiver, they go get your records from your doctors and they'll find out that stuff.

From this evidence, it would not be unreasonable for a fact finder to infer that Babayan was not sure of the date of her accident. Taking Babayan's testimony as true, an inference can be drawn that Babayan relied upon Gallina's representation that the accident was "far enough away" that it did not have to be listed in the application. A fact finder could ultimately decide to reject Babayan's answer as implausible, but, based upon evidence in the record, it was inappropriate for the court to reach that conclusion at the summary judgment stage.

**4.**

In contrast, the District Court correctly determined that Babayan's false answer to Question 33.k constituted bad faith as a matter of law. Based upon the detailed nature of Question 33.k, Babayan's response, and Babayan's deposition testimony, the only

23

reasonable inference a fact finder could draw would be that the answer to Question 33.k was made in bad faith or with knowledge of its falsity.

In support of her argument that she produced sufficient evidence to create a genuine issue of material fact as to whether her answers were made in bad faith, Babayan points out that she disclosed: the name of her family doctor; that she had once been hospitalized overnight; that she suffered from Bell's Palsy within the past year; and that she was treated for pain relief as a result of a virus. The problem with Babayan's argument is that the information she provided cannot be reconciled with the actual false representation she made in filling out her application. The information she points to as sufficient to create a genuine issue of material fact is irrelevant to the specific question at issue.

Question 33 (set forth in the footnote below), contains fifteen detailed and distinct categories of queries regarding the applicant's medical treatment over the past ten years.[17]  In this context, it is clear

---

[17]The question, in full, reads as follows:

33.    In the last 10 years, have you had, been told you had or been treated for:

a.    Disorder of eyes (including double vision), ears, nose, mouth, throat, or speech?

b.    Dizziness, loss of balance, headaches, seizures or convulsions, muscle weakness, tremor, paralysis, stroke, memory loss, or any disease of the brain or nervous system?

c.    Anxiety, depression, stress, or any psychological or emotional condition or disorder?

that Question 33.k requires a specific answer as to whether the applicant was diagnosed with or treated for any of the specific disorders that are listed (arthritis, sciatica, gout, or any disorder of the

---

    d.    Persistent shortness of breath, hoarseness, cough, coughing up blood, asthma, emphysema, tuberculosis, or any lung or respiratory disorder?

    e.    Jaundice, hepatitis, intestinal bleeding, ulcer, hernia, colitis, diverticulitis, recurrent indigestion, or any disorder of the stomach, intestines, liver, gall bladder, or pancreas?

    f.    High blood pressure, chest pain, chest discomfort, chest tightness, irregular heart beat, heart murmur, heart attack or any other disorder of the heart or blood vessels?

    g.    Sugar, albumin, blood or pus in the urine, sexually transmitted or venereal disease, or any disorder of the kidney, bladder, prostrate, or reproductive organs?

    h.    Diabetes, thyroid or any glandular (endocrine) disorder?

    i.    Cancer, tumor, polyp, or disorder of the lymph gland(s) or breast(s)?

    j.    Anemia, bleeding tendency, or any disorder of the blood?

    k.    *Arthritis, sciatica, gout, or any disorder of the muscles, bones, joints, spine, back, or neck?*

    l.    Chronic or unexplained fatigue, fever, or illness?

    m.    Any allergies?

    n.    Any disorders of the skin?

    o.    Deformity, lameness or amputation?

25

muscles, bones, joints, spine, back, or neck).  During a lengthy colloquy with Northwestern's counsel during her deposition Babayan expressly admitted each of the following facts:

- she sought treatment and care from five (5) physicians regarding knee and back pain on numerous occasions during the relevant ten-year time period listed on the application;

- she underwent at least five (5) magnetic resonance imaging ("MRI") tests on her knees and/or back, and she had an electromyogram ("EMG") because of chronic back problems;

- she was aware that these diagnostic tests revealed abnormalities in her knees and back;

- she was aware that she was diagnosed with a bulging disc in her back; and

- she received a cortisone injection in her knee to reduce constant pain.

Furthermore, the record contains a verified complaint Babayan filed in state court following her slip-and-fall accident in which she alleged that, as a result of her accident, she "was caused to sustain serious personal injuries to her knee and hip and surrounding areas."  *See Whiting v. Krassner*, 391 F.3d 540, 543-44 (3d Cir. 2004) ("Judicial estoppel prevents parties from taking different positions on matters in litigation to gain advantage.").[18]  In spite of these concessions,

---

[18]Babayan's deposition testimony in the state court matter, which contains a lengthy discussion of the injuries she suffered as a

26

Babayan answered "no" to Question 33.k. She testified in her deposition that the question was unclear,[19] but that with her "new understanding" she agreed that her previous answers were "inaccurate." In addition, although Babayan conceded that she did not read her responses on the final application, she admitted that she certified her answers were truthful and accurate.

The fact that Babayan was hospitalized for one night for blood tests, received a prescription for pain relief as a result of a virus in January 2001, and missed six days of work with Bell's Palsy within the six months prior to her application is irrelevant to the question of whether she was diagnosed with or treated for "arthritis, sciatica, gout, or any disorder of the muscles, bones, joints, spine, back, or neck."[20] Neither is it relevant that Gallina may have told Babayan not

result of her accidents, is part of the record.

[19]Babayan claims she thought the term "disorder" meant "disease," and that she should have asked Gallina for clarification.

[20]That information would have been relevant if, for example, Northwestern had challenged Babayan's "no" answer to Question 33.b. That question asked whether the applicant had been treated for or diagnosed with "[d]izziness, loss of balance, headaches, seizures or convulsions, muscle weakness, tremor, paralysis, stroke, memory loss, or any disease of the brain or nervous system." Babayan's diagnosis of Bell's Palsy arguably falls under the category of symptoms listed in Question 33.b, yet she failed to answer the question affirmatively. Babayan answered "yes" to Question 37, however, and stated that she missed some time at work due to a "virus which caused Bell's Palsy." Under those circumstances, there would have certainly been an issue of fact as to whether Babayan's false answer to Question 33.b was made in bad faith when considered

27

to list the automobile accident on the application because it occurred far enough in the past.[21] Information regarding the accident is not "incomplete" as to the issue of whether Babayan was treated for or diagnosed with any of the specific disorders listed in Question 33.k. Rather, like the answer at issue in *Burkert*, Babayan's answer can be characterized as "frivolous" in the face of substantial evidence that she visited five different physicians on a number of occasions relating to problems with her knees and back, and that diagnostic tests confirmed that she had knee and back problems. On this information, the only reasonable inference a fact finder could draw is that Babayan answered "no" in bad faith or knowing that her answer was false.

Babayan's concept of "incompleteness" seems to be that if an applicant provides evidence of a certain medical problem, the applicant does not have to provide any other information in answering a question regarding a totally different type of medical problem in order to survive a motion for summary judgment. That argument is a *non sequitur*. For example, suppose Babayan, who checked "no" to a question asking whether she had "high blood pressure," took a daily prescription to control her high blood pressure. Would the fact that she disclosed that she had Bell's Palsy for six days over the past year be sufficient to support an inference that her answer to the blood pressure question was merely "incomplete" rather than knowingly false? Sound public policy counsels against embracing Babayan's concept of "incompleteness." *See Orr v. Union Fidelity Life Ins. Co.*, 198 A.2d 431, 432-33 (Pa. Super. Ct. 1964) (holding that an answer describing only one of numerous injuries to a question asking

in connection to her response to the subsequent question.

[21]There is no support in the record for Babayan's argument that she relied upon Gallina's advice to answer Question 33.k. *See* section III.E, *infra*.

28

applicant to list "any" injuries was not a truthful answer to a question on an insurance application). In the face of incontrovertible documentary evidence that she was treated on numerous occasions for back and knee pain during the relevant time period, Babayan cannot defeat Northwestern's motion for summary judgment by pointing to her disclosure of unrelated ailments. In this respect, the District Court did not err in finding that Babayan's answer to Question 33.k was made in bad faith as a matter of law and in entering summary judgment in favor of Northwestern on counts one and two of Northwestern's complaint.

## B. Babayan's Breach of Contract Claim

Because the District Court correctly concluded that the disability insurance contract was void ab initio, the District Court did not err in granting Northwestern's motion for summary judgment as to Babayan's breach of contract claim. It is axiomatic that a breach of contract claim may not be maintained in the absence of a valid contract. *See Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.*, 764 A.2d 1106, 1109 (Pa. Super. Ct. 2000) (holding that a claim for breach of contract requires the existence of a contract, including its essential terms). Thus, the District Court properly dismissed count four of Babayan's complaint.

## C. Babayan's Bad Faith Claim

Babayan's bad faith claim against Northwestern is premised primarily on the argument that Northwestern's "post-claim underwriting practices" constituted bad faith. We conclude that the District Court correctly determined that Northwestern was entitled to summary judgment on Babayan's bad faith claim.

29

**1.**

The Pennsylvania statute governing bad faith insurance actions provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. ANN. § 8371. The statute does not define the term "bad faith." We have predicted that the Pennsylvania Supreme Court would define the term according to the definition set forth by the Pennsylvania Superior Court in *Terletsky v. Prudential Property and Casualty Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1984). *See Keefe v. Prudential Property and Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir. 2000). There, the court adopted the following definition of "bad faith":

> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose

30

and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky*, 649 A.2d at 688 (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)) (citations omitted).

Ultimately, in order to recover on a bad faith claim, the insured must prove: (1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. *Keefe*, 203 F.3d at 225. Courts have extended the concept of "bad faith" beyond an insured's denial of a claim in several limited areas. *See W.V. Realty, Inc. v. Northern Ins. Co.*, 334 F.3d 306, 317-18 (3d Cir. 2003) (insurer's failure to follow internal guidelines evidence of bad faith); *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 381 (Pa. Super. Ct. 2002) (insurer's claims practice manual is relevant evidence in bad faith claim against insurer); *O'Donnell ex rel. Mitro v. Allstate Ins.*, 734 A.2d 901 (Pa. Super. Ct. 1999) (bad faith may extend to the misconduct of an insured during the pendency of litigation); *Liberty Mut. Ins. Co. v. Marty's Exp., Inc.*, 910 F. Supp. 221 (E.D. Pa. 1996) (bad faith may extend to an insurer's conduct in retrospectively rating and collecting premiums). The insured is required to meet its burden of proving "bad faith" by clear and convincing evidence. *Terletsky*, 649 A.2d at 688. Although the insurer's conduct need not be fraudulent, "mere negligence or bad judgment is not bad faith." *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004).[22] The insured

---

[22]For example, an insurer's denial of a claim does not constitute bad faith if it is based on a reasonable legal position in an unsettled area of the law. *Terletsky*, 649 A.2d at 690; *Brown*, 860

must ultimately show that "the insurer breached its duty of good faith through some motive of self-interest or ill will." *Id.* At the summary judgment stage, the insured's burden in opposing a summary judgment motion brought by the insurer is "commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

**2.**

Babayan argues that we should predict that the Pennsylvania Supreme Court would conclude that "post-claim underwriting" may constitute bad faith. Babayan concedes in her brief that there are no decisions interpreting Pennsylvania law that have extended bad faith claims to post-claim underwriting practices. Babayan, however, urges us to consider "the law of bad faith generally." Specifically, she directs us to consider a decision of the Mississippi Supreme Court, *Lewis v. Equity National Life Ins.*, 637 So.2d 183 (Miss. 1994), and a law review article condemning the practice. *See* Thomas C. Cady & Georgia Lee Gates, *Post Claim Underwriting*, 102 W.Va. L. Rev. 809, 810 (2000) (concluding that post-claim underwriting is *per se* evidence of bad faith).[23]

---

A.2d at 501. Neither does an insurer's low, but reasonable estimate of damages or loss constitute bad faith. *Id.*

[23]In *Lewis*, the Mississippi Supreme Court held that an insurer engaged in post-claim underwriting in bad faith because the insurer issued a policy under simplified guidelines and admittedly failed to perform any underwriting on the policy under after the insured filed her claim. 637 So.2d at 188-89. A subsequent decision interpreting *Lewis*, however made a distinction between post-claim underwriting

We need not determine whether the Pennsylvania Supreme Court would hold that the practice utilized by the insurer in *Lewis* constitutes bad faith. We note that the concept of "post-claim underwriting" itself is nebulous, particularly because it is difficult to draw a distinction between post-claim eligibility investigation and post-claim underwriting. For example, Pennsylvania law provides that it is not bad faith to conduct a thorough investigation into a questionable claim. *See O'Donnell*, 734 A.2d at 907-08 (noting the existence of "red flags" that prompted the investigation). *See also New York Life Ins. Co. v. Johnson*, 923 F.2d 279, 280 (3d Cir. 1991) (referencing period of contestability based upon material misrepresentations).[24]    Babayan's concept of "post-claim

and post-claim investigation of eligibility. In *Wesley v. Union National Life*, 919 F. Supp. 232 (S.D. Miss. 1995), the district court determined that an insurer did not engage in post-claim underwriting because, unlike the simplified application at issue in *Lewis*, "the questions on the insurance application were one method for screening out applicants who presented unacceptable risks." *Id.* at 235. Thus, the court concluded that the insurer's practices did not constitute bad faith because "to deny [the insurer] the right to engage in post claim investigation would mean that insurers would have to investigate every answer by every applicant before insuring them and to pay claims *regardless of the misrepresentations contained in the application*." *Id.* (emphasis added).

[24]As Northwestern points out in its brief, a Pennsylvania statute seemingly condones the practice of post-claim investigation with respect to health and accident insurance policies. That statutory provision states:

> The falsity of any statement in the application for any policy covered by subdivision (b) of this article shall

33

underwriting" would usurp this general principal and prevent insurers from engaging in post-claim investigations, even in the face of incontrovertible evidence that an insured made a clear misrepresentation.

Moreover, Babayan's bad faith claim would not succeed even under the more demanding Mississippi test set forth in *Lewis*. The evidence is clear that Guss approved Babayan's policy after reviewing the application, nonmedical questionnaire, and the paramedical questionnaire. Based upon Babayan's responses in the documents, including the medical information that she provided, Guss did not seek to obtain Babayan's medical records. Thus, Northwestern utilized Babayan's responses as "one method for screening out applicants who presented unacceptable risks." *Wesley*, 919 F. Supp. at 235. When Babayan brought her claim within the two-year contestability period,[25] an investigation was triggered under company policy. The fact that someone with the title of "underwriter" was involved in the investigatory process does not transform a permissible post-claim investigation into impermissible post-claim

---

not bar the right to recovery thereunder, unless such false statement was made with actual intent to deceive, or unless it materially affected either the acceptance of the risk or hazard assumed by the insurer.

40 PA. CONS. STAT. ANN. § 757.

[25]Northwestern's claims manual states: "If, during the two year contestability period, the Company becomes aware of material misrepresentations in that information, it has the right in most states to rescind the policy and deny the claim."

34

underwriting.[26]  For these reasons, we conclude that the particular practice undertaken by Northwestern in this case did not constitute bad faith.[27]  Accordingly, the District Court did not err in granting

---

[26]In fact, the claims manual recognizes that, in order to determine whether a policy should be contested, the company "need[s] input from Underwriting Standards, and, on occasion, from the Law Department to make that decision."

[27]Additionally, Babayan argues that Northwestern committed bad faith by failing to follow its own claim review policies.  The District Court stated in its opinion that Babayan failed to provide any support for the proposition that an insurer's failure to follow its claim review policies would constitute bad faith.  Although no court interpreting Pennsylvania law has directly spoken on the issue, we suggested in *W.V. Realty, Inc.* that an insurer's failure to follow its internal guidelines could constitute evidence of bad faith.  334 F.3d at 317-18; *see also Bonenberger*, 791 A.2d at 381 (holding that an insurer's claims practice manual was relevant evidence in a bad faith claim against the insurer).  Assuming without deciding that failing to follow internal claims procedures could constitute bad faith, summary judgment remains appropriate in this particular case.  It is true that Northwestern's claims manual lists two "factors" to consider (the cause of the disability and inconsistent information provided by the applicant) in undertaking a contestable review, and that Duller testified that neither of these factors existed in Babayan's case.  A review of the claims manual, however, reveals that these two factors are not exclusive requirements to trigger a contestable review.  Rather, the manual states that the review process must be completed if a claim is brought within the "two-year contestable period," and that the claims analyst must "start the process of verifying the information provided on the application as soon as possible."  Duller testified that she requested records from Babayan's doctor and

summary judgment in favor of Northwestern as to count one of Babayan's complaint.

## D. Babayan's Negligence Claim

A claim for negligence under Pennsylvania law contains four elements:  (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interests of another.  *In re TMI*, 67 F.3d 1103, 1117 (3d Cir. 1995) (citations omitted).  Babayan's negligence claim is premised on the allegation that "Ms. Babayan followed Mr. Gallina's instructions and did not advise [Northwestern] of her motor vehicle accident and slip and fall accident."  Accepting Babayan's allegation as true, her negligence claim fails based upon our holding that Northwestern is entitled to rescission because of Babayan's bad faith response to Question 33.k.  As a result, even if Babayan could establish that Gallina breached a duty[28] to advise Babayan to provide

---

attempted to verify information as part of  "performing a routine review."  Kien confirmed in his deposition testimony that, over the course of his 25-year tenure at Northwestern, analysts were required to "automatically perform" a "routine review if a claim presents in a contestable time frame."  Babayan is unable to point to any evidence to refute this testimony and to support her argument that Northwestern's review of her claim within the two-year time period constitutes a failure to follow internal guidelines.

[28]We have stated, under Pennsylvania law, that "an insurance broker is under a duty to exercise the care that a reasonably prudent businessman in the brokerage field would exercise under similar

36

an accurate response to Question 14.K.2, Babayan cannot prove that Gallina's purported breach was the cause of her damages – Northwestern's rescission of the insurance agreement. That rescission was based upon Question 33.k.

Babayan's assertion that Gallina instructed her not to put information about her prior medical history on her insurance application is not supported by the record.[29] The fact that Gallina allegedly told Babayan not to worry about the date of her accident on a question that inquired about motor vehicle accidents within the past five years is irrelevant to Babayan's response to a question asking her to list specific medical ailments she suffered within the past ten years. Thus, because there is no evidence that Gallina's alleged negligence caused Northwestern to rescind Babayan's policy, we will affirm the District Court's entry of summary judgment in favor of Gallina on Babayan's negligence claim at count three of her complaint. *See Industrial Valley Bank & Trust Co. v. Dilks Agency*, 751 F.2d 637, 640 (3d Cir. 1985) (an insurance customer must prove that broker's failure to exercise due care is the "direct cause of loss to his customer").[30]

_____

circumstances. . . ." *Consolidated Sun Ray, Inc. v. Lea*, 401 F.2d 650, 656 (3d Cir. 1968).

[29]Babayan cites to deposition testimony relating solely to Gallina's alleged failure to advise her appropriately regarding her answers to Question 14.K.2. This deposition testimony would only be sufficient to create a genuine issue of fact as to Babayan's response to Question 14.K.2, and is insufficient to establish causation and damages with respect to Question 33.k.

[30]The parties agreed at oral argument that the District Court's alternative basis for granting summary judgment on the negligence

37

## IV.  Conclusion

Based upon the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Northwestern and Gallina.

---

claim – that the common law discovery rule was inapplicable because Babayan learned of her alleged injury within the applicable limitations period, yet failed to exercise due diligence to prosecute her claim – was overruled by the Pennsylvania Supreme Court's recent decision in *Fine v. Checcio*, 870 A.2d 850, 859 (Pa. 2005).  In that decision, the Pennsylvania Supreme Court held that, for purposes of applying the discovery rule, it is immaterial whether the prescribed limitations period has expired at the time the plaintiff becomes aware of an injury.  Rather, "the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises." *Id.* at 859.